Andrew Bondarowicz
Bondarowicz and Associates
125 Elm Street
Westfield, NJ  07090
908.456.8882

Counsel for Plaintiff David L. Hawk

UNITED STATES DISTRIT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| David L. Hawk | CONFIDENTIAL |
| 94 Tinc Road | Civil Action No. 2:10-cv-06140-FSH-PS |
| Flanders NJ 07836 | |
| Plaintiff, | |
| vs. | |
| New Jersey Institute Of Technology | |
| University Heights Newark NJ 07102 | |
| Robert A. Altenkirch | |
| University Heights Newark NJ 07102 | |
| Donald H. Sebastian University Heights Newark NJ 07102 | |
| Defendants. | |

**AMENDED COMPLAINT**

## The Parties

1.

    a. Plaintiff herein is David L. Hawk ("Hawk"), an adult individual residing at 94 Tinc Road, Flanders, NJ, 07836.

        b.

            i. Hawk was first appointed to the faculty of the Defendant New Jersey Institute of Technology ("NJIT" or the "University") in September, 1981 with the rank of associate professor in NJIT's School of Architecture.

            ii. From September 1983 to September 1984 he served as Associate Dean of Architecture.

            iii.

                A. Hawk was first appointed to the faculty of the School of Management at NJIT (the "School of Management" or the "School") in 1991, with the rank of full professor.

                B. At the same time Hawk's appointment to the faculty of the School of Architecture continued; he thus served on the faculties of both Schools with the additional status and stature of Dual Professor, a distinction that, uniquely, permitted him to serve as a voting member of the promotion and tenure committees of both Schools.

            iv. He was awarded the title and distinction of an NJIT Master Teacher in 2001, only the third person to be so recognized.

        c.

            i. At June, 2005 he was asked by Priscilla Nelson ("Nelson"), at the time Provost at NJIT, to serve as Interim Dean of the School of Management.

            ii. At June, 2006 he was asked by Nelson to serve as permanent Dean of the School; the effective date of the appointment was July 1, 2006.

d. Hawk served as Dean of the School of Management until January, 2008 and continued to serve as Dual Professor thereafter.

2. Defendant Donald H. Sebastian ("Sebastian") is an adult individual, at the time of filing this Complaint an employee of Defendant NJIT, and at times relevant to this action served as Interim Provost at NJIT.

3. Defendant Robert A. Altenkirch ("Altenkirch") is an adult individual, at the time of filing this Complaint an employee of Defendant NJIT, and currently and at all times relevant to this action serves and served as President of NJIT.

4. Defendant NJIT is a public university, with offices and a campus at University Heights, Newark, NJ, 07102.

## Allegations by Hawk Against the Defendants

Defendants have deprived Hawk of liberty and property interests under color of New Jersey law and without Due Process

Defendants' Actions have Deprived Hawk of Liberty and Property Interests

5.

a. By letter dated August 28, 2009 (the "August 28, 2009 Letter") the University, acting through, among others, Defendant Donald H. Sebastian, placed David Hawk "on administrative leave" and barred him from visiting his office, returning to campus and speaking with NJIT students; a true and correct copy of the August 28, 2009 Letter is attached hereto as Exhibit "A" to the original Complaint in this matter.

b. The action announced by Sebastian at August 28, 2009 and enforced by NJIT from that time through the filing of this Amended Complaint deprived Hawk of liberty and property interests under color of law and without due process.

6.

a. By letter dated August 23, 2010 (the "August 23, 2010 Letter") the University, acting expressly through, possibly among others, Defendant Robert A. Altenkirch, stated to Hawk,

"that it is the university's intention to institute proceedings before the NJIT Board of Trustees pursuant to N.J.S.A. 18A:3B-6 to remove you from tenured NJIT employment"

b. The August 23, 2010 Letter also stated that Hawk was

"hereby suspended without pay effective at the close of business, September 3, 2010"; a true and correct copy of the August 23, 2010 Letter is attached hereto as Exhibit "B" to the original Complaint in this matter.

7.

a. The University did in fact cease payment of Hawk's salary "at the close of business, September 3, 2010" and has not to the time of filing this Amended Complaint resumed such payment.

b. The action announced by Altenkirch at August 23, 2010 and enforced by NJIT from that time through the filing of this Amended Complaint deprived Hawk of liberty and property interests, in addition to the deprivations effected by Sebastian and the August 28, 2009 Letter, and did so under color of law and without due process.

8.   The August 28, 2009 Letter deprived Hawk, to his current knowledge, of the following liberty interests:

a.        His right to freedom of association, arising under and guaranteed by the First Amendment to the constitution of the United States.

b.        His constitutionally recognized right to pursue his profession without governmental interference.

c.        His common law right to be free of tortuous interference with present and potential commercial agreements and opportunities, including to Hawk's present knowledge the following:

                i When associates with whom Hawk has worked in this country and abroad learned that he had been barred from the NJIT campus and could not receive visitors, phone calls or mail at his NJIT address former associates stopped visiting, calling and/or sending mail to Hawk.

                ii.

                      A.        On the occasions when books, papers, cards, or letters are sent to Hawk at NJIT they are rarely  delivered to him; Hawk has

not been told by NJIT, and does not know, to where, by whom, or upon whose instruction this material, sent through the US mail, is diverted at the University.

B.

(1). On one occasion after Sebastian's action Hawk was sent a thank you letter and a check for $400,000, addressed to Hawk at NJIT.

(2). The check was from the Leir Foundation and was intended as an installment on a grant he received.

(3). Neither the letter nor the check were delivered to Hawk, but rather were put under a secretary's desk in what was called "David Hawk's junk mail."

(4). Hawk learned of this only months after the check and letter had been sent; he was told of it by an administrator.

C.      On another occasion Hawk was sent an invitation to be the guest of honor at a celebration for a company Hawk had advised; the invitation was sent to Hawk's NJIT address and Hawk never learned of it until after the celebration.

iii.

A.      Colleagues with whom Hawk developed collaborative relations and had come to trust and respect over four decades no longer seek him out; some presume that he "must have done something wrong, otherwise why would they have charged him?"

B.      Colleagues at the University of Pennsylvania, University of Iowa, Stockholm School of Economics, Helsinki University of Technology, Tsinghua University, Oxford University and Tokyo University have stopped sending him papers and proposals to review, and invitations to collaborate.

C.      Prior to Sebastian's action Hawk would routinely be asked to give ten or more keynote lectures a year; during the year since

Sebastian's action Hawk has been asked to deliver only two such lectures.

D.      Prior to Sebastian's action Hawk was frequently asked by colleagues at the National Science Foundation and the National Academy of Sciences to review studies related to his areas of science; Hawk no longer receives such requests.

E.      From 1975 until Sebastian's action Hawk was asked to participate in research projects, report preparation, or advise companies 5 to 10 times a year; from the time of Sebastian's action he has received no such invitation.

F.      Company executives have stopped asking Hawk to review their ideas for expansion.

G.      A project Hawk was preparing on an innovative plan to expand pharmaceutical development in New Jersey in collaboration with Chinese experts and investors was halted with only a short message from the New Jersey CEO that, "I have no interest in this anymore."

H.       Prior to Sebastian's action Hawk was the key international adviser to assist the principals of a foreign firm planning to buy an existing, vacant, 950,000 ft² building in New Jersey and convert the building to their US headquarters with a foreign and US university component central to the project; from the time of Sebastian's action progress has been halted while the president of the foreign firm awaits the outcome of the allegations made against Hawk by the Defendants and others at NJIT.

I.      Prior to Sebastian's action Hawk met frequently over several years with the president of a NYC development firm that owns the land and plans to make major investments in Newark, NJ. Hawks' role was to bring international investors into the NJ development to make it international in character and built around energy efficient

technology. Since, September, 2009, when Hawk informed the NY executive of his being barred from NJIT Campus that same executive has not called Hawk nor met with him.

       J.       Colleagues and friends from Europe and Asia who, prior to Sebastian's action, routinely called Hawk and/or stayed overnight at his home to discuss economic and related policies and projects have, since Sebastian's action, ceased to do so.

    iv. Alumni who had regularly sought Hawk's advice on how best to develop their own careers now send only notes of condolence and sadness at what has befallen him.

    v. Hawk is compelled to turn current students away when they seek his counsel, telling them that he is forbidden to speak with them.

9.

    a. As the direct and foreseeable consequence of Sebastian's action and the actions stated in the August 28, 2009 Letter and enforced by NJIT, Hawk's name, reputation, honor, integrity, commercial opportunity, and goodwill, developed over more than forty years of service in the US armed forces, attaining graduate degrees, and working to assist public and private organizations in this country and aboard have been materially, dramatically, damaged, most likely irreparably so.

    b. Hawk's investment of his reputation in the service of facilitating economic development in Newark and in the state at large has been severely, and most likely irreparably, harmed.

10. The August 28, 2009 Letter deprived Hawk, to his current knowledge, of then present, fully choate property interests arising under common law in the long-standing business and professional relationship and interests set forth above in Paragraph 9.

11. The August 23, 2010 Letter continued, and by continuing materially increased the prejudicial consequences of, the deprivations of liberty interests caused by the August 28, 2009 Letter.

12. The August 23, 2010 Letter deprived Hawk, to his current knowledge, of his current, fully choate property interest in the enjoyment of the bargained for terms of his contract of employment with NJIT, and continued, and by continuing materially increased the

prejudicial consequences of, the deprivations of property interests caused by the August 28, 2009 Letter.

Defendants' Actions have Deprived Hawk of Liberty and Property Interests without the Due Process of Law Required under All the Circumstances of Their Actions

13.

     a. Contrary to the most fundamental due process requirement recognized in Anglo-American law, Defendants found and proclaimed Hawk guilty of violations of law and University policy before Hawk was first told, on July 1, 2009, of the charges against him.

     b. Such prejudgments are evidenced beyond dispute in the July 14, 2009 letter (the "July 14, 2009 Letter") written to Hawk by Holly C. Stern, Esquire, then and the time of filing this Amended Complaint NJIT's General Counsel.

     c. Equally indisputable oral utterances attributed to the General Counsel are set attached, without denial by the General Counsel, as Exhibits to her own Certification in support of Defendants' opposition to Plaintiff's pending motion for injunctive relief.

     d. Robert English, Interim Dean of the School, has stated publically to the School's faculty, as an established conclusion, that "Hawk will not be back" and that a search must me mounted to fill Hawk's "line".

14.

     a. During the now 34 months of Defendants' "audits", "investigations", "reports", and other quests for accusations, however incredible, unsubstantiated, and immaterial, against Hawk, Defendants' have proceeded without guidance from established procedures of due process, or indeed of any form of rule-governed inquiry into disputed facts.

     b. They have proceeded oblivious to and happy to proclaim as established fact the most obvious and fundamental of errors in the statements they eagerly absorbed from individuals happy to serve Altenkirch's ends.

     c. They have gone forward reckless in their own misreading of documents they seized upon, motivated not by a search for truth in disputed fact but by desperate determination to pile false allegation upon false allegation in the service of Altenkirch's animus-driven goal of driving Hawk out of the University by any means at hand, Altenkirch having acknowledged in 2008 that he could find no legal means of doing so.

15. The University has permitted, if not caused, the corruption of the evidentiary record, the body of evidence whose integrity is the sine qua non of any fair and accurate assessment of the truth.

a. Sensitive e-mail correspondence, including correspondence from the University Vice President for Academic and Student Services, has disappeared from the University's server.

b.

i. More specifically, the missing correspondence is of material relevance to the issue of the "stewardship of University resources".

ii. The missing evidence is supportive of Hawk's defense and casts the "stewardship" exercised by members of the University's administration in a not-favorable light; a true and correct copy of a hard copy of the missing e-mail is attached hereto as Exhibit "A".

c.

i. Tedesco, who was particularly knowledgeable because of her prior service as Associate Dean, advised English that he should safeguard the main computer in Tedesco's former office because it was the depository of Promotion and Tenure, hiring, student performance, past legal case evidence, and other records from 2005 until 2008.

ii. English nevertheless subsequently reformatted the hard drive to "clean off all records."

iii. Additionally, several faculty members observed English on several occasions emptying the paper files from Tedesco's former office into dumpsters, even though Tedesco told him of their legal and historic significance.

d. During Hawk's absence from campus in March 2008 someone used a University key to enter Hawk's locked office, unlawfully take $4,000 of receipts of material importance to the allegations made against Hawk, removed from his computer a number of equally material electronic files, and proceeded to print out Hawk's e-mails, a fact that Hawk discovered when, on returning to his office and finding his printer unexpectedly out of paper, he placed paper in the feeder and proceeded to which the remaining e-mails print out.

e. The University's false statement regarding the content of Ms. Ikonen's Complaint in divorce, whether intentionally false or arising from gross incompetence, is

in either case a corruption of the evidence on what the General Counsel claims is "One of the most significant issues brought to light" in the University's accusations against Hawk.

16.

a. Defendants' pursuit of Altenkirch's vendetta against Hawk arises, to the extent it can be thought to have arisen from any impetus that can be rationally characterized, from Hawk's – as Altenkirch perceived it – effrontery not simply in disagreeing with Altenkirch's "vision" for the School but in gaining plaudits and national recognition in the process, those pressed into service by Altenkirch.

b. That pursuit is well-characterized by this iconic statement, presumably made to show the strength of the evidence against Hawk but in fact showing the utter incompetence of NJIT's "investigations", from the University's "Ethics Liaison Officer", Jean Feeney:

> "Eleven of the individuals interviewed as part of this investigation stated that they knew, or had been told, that Hawk and Parhankangas had a past personal and/or professional relationship". Jean Feeney Certification.

17. The utterly false and hollow character of Defendants' claims of concern for "ethics" and "internal evaluations" is shown by their effort not to engage in an even-handed analysis of allegations of wrong-doing by Hawk but rather to use their threats of "criminal charges" and "bringing Trenton in" as a stick with which to beat Hawk into accepting Defendants' one and only true end: his resignation from his tenured position at NJIT.

18. At a July 1, 2009 meeting, in the presence of Hawk and Denise Coleman, Esquire, Director of Labor/Employee Relations & Compliance at NJIT ("Coleman"), Sebastian stated as matters of determined fact that Hawk:

a. had violated the NJ Conflict of Interests Act (the "Act");

b. failed to exercise proper stewardship over University and state resources;

c. could be charged by the University with "criminal" conduct; and

d. had in other ways acted in contravention of his duties arising under state law and University policy.

19.

a. Despite these allegedly grave breaches of law, the University has stressed to Hawk that he should not wish to have "Trenton get involved" with the charges against

him, and that he could and should avoid such involvement by resigning and accepting emeritus professor status.

b. NJIT has offered Hawk an opportunity to avoid adjudication of the claims against him despite alleging to him that "Trenton" is "dying to get into the life" of the state's universities.

c. There is no evidence that the University's actions are undertaken to support the mandate of the Act or the New Jersey State Ethics Commission (the "Commission"), and abundant evidence that it is the Defendants, not Professor Hawk, who have reason not to "get Trenton involved".

20.

a. Hawk asked Sebastian what criminal charges NJIT thought it could bring against him.

b. Sebastian replied that NJIT could not tell Hawk what the charges were because NJIT had not yet "formalized" them.

c. Sebastian then stated that if the charges were "formalized" NJIT would have to advise "the state" of the charges.

d. Hawk told Sebastian that he, Hawk, did not know of anything that he had done wrong, civilly or criminally, and could not consider whether to resign without knowing what the charges were against him.

e. Sebastian then told Hawk that a written statement would be prepared and sent to him; Sebastian asked Coleman when the statement could be ready.

f. Coleman replied, "That will be difficult but perhaps in a couple of weeks we can have something prepared."

g. Sebastian said, "That is too late. This must be done sooner than that."


21.

a. On information and belief, as well as on the basis of direct personal knowledge, Hawk alleges that NJIT is not conducting an "investigation" as a means of maintaining ethical standards at the University, discharging its obligations under the

Act, or in general supporting the Act's or the Commission's purpose, or in conducting an "investigation" of any kind.

b. On the contrary, NJIT is conducting a campaign of intimidation, contemptuous of the law, guided and prompted wholly by personal animus aimed at Hawk and motivated by such animus in a effort to compel David Hawk's involuntary resignation through actions whose apparent intent and clearly discernable result is solely to impose increasing burdens upon Professor Hawk meant to achieve a wrongful end under color of law.

22. On information and belief Hawk alleges that NJIT's efforts to purge him from the senior, tenured faculty position is only the most recent in a pattern of such efforts, undertaken at Altenkirch's instruction, carried out without regard for lawful process, and arising solely from personal animus directed by those able to abuse a vulnerable system with resultant harm to the State of New Jersey as well as to those against whom their animus is directed.

23. More specifically, Hawk believes, and on information and belief alleges, that there are additional examples of NJIT's threatening that "Trenton will get involved" if individuals NJIT wishes to purge from administration and the faculty do not resign without seeking a meaningful opportunity to meet the charges against them.

24.

a. For example, former Associate Dean of the School of Management, Dr. Barbara Tedesco ("Tedesco"), confronted by tactics of the kind repeated against Hawk, was compelled to resign her administrative post under threat of matters "going to Trenton" if she refused to resign.

b. Interim Dean of the School of Management Robert English ("English") and NJIT Vice President for Human Resources Ted Johnson ("Johnson") asked Tedesco to resign.

c. When Tedesco asked why her resignation was sought she was told that the request was made because of charges against her in an NJIT report titled "Mismanagement of Management"

d. Tedesco asked what the charges were and if she could see the report.

e. Johnson replied that she could not see the report, and that if she were permitted to see the charges NJIT "would be forced to send them to Trenton and we didn't want to do that".

f. Tedesco denied any wrong doing but agreed to resign because she was afraid and intimidated.

25.

a. Hawk believes, and on information and belief alleges, that during an argument between School of Management Professor Mark Somers ("Somers") and English, English told Somers to be careful or he [English] would have Somers "investigated"' by NJIT.

b. Hawk further believes, and on information and belief alleges, that on the morning after English's threat an "investigator" came to Somers' office to question Somers about an MBA program that Somers had organized.

26.

a. Vanessa Liu ("Liu") formerly a professor in the School of Management with expertise in computerized marketing and international accounting, earned top ratings as a researcher and teacher, and was listed by the accreditation team as one of the new faculty that would greatly enhance the future development of the School of Management.

b. In 2006 and 2007, Liu, in addition to discharging her teaching duties and with no additional compensation, traveled to Asia in support of two major projects she had agreed to undertake on behalf of the School of Management.

c.

 i. In the Spring of 2008 Liu's father became gravely ill.

ii. Liu was her father's only care giver.

iii. She applied to the University for paid family leave; her application was denied.

iv. On information and belief, Hawk alleges that the denial came at the express direction of Altenkirch; the Interim Dean of the School of Management, then as now English; and Vice President for Human Resources Johnson on the ground

that Liu had acted unethically in traveling to China on School of Management

business during the two semesters she was teaching and researching at NJIT,

thus abusing University funds.

v. Because of the urgency of her father's need, Liu then applied for family leave,

without pay, to care for her ill father.

vi. This request also was denied, and Liu was advised by English to resign rather

than face an investigation into her travels.

vii. On information and belief, Hawk alleges that the allegedly unethical aspects

of Liu's travels were never specified.

viii. Liu's father died soon thereafter

27.

a. Three other NJIT professors, after widely asserting that they were not going to

retire from NJIT, suddenly did retire, without explanation.

b. None of the three are willing to discuss the circumstances of their change in

decision.

c. On information and belief, Hawk alleges that additional faculty members who

have "retired" would, if subpoenaed and given protection against retaliation, testify

that they had been "persuaded" to retire by means of coercive tactics.

28.

a From the time of Sebastian's action and the August 28, 2008 Letter through the

filing of this Amended Complaint, Hawk has repeatedly and consistently sought and

has been repeatedly and consistently refused all meaningful opportunity to meet the

case alleged against him by Defendants.

b. The only written statement of "charges" against Hawk that Hawk was

permitted to see prior to Defendants' submitting their opposition Brief and papers to

this Court was the July 14, 2009 Letter.

c. Although Defendants in their Certifications attached to their opposition Brief

declare that they write to set forth facts necessary for the Court's adjudication of

Plaintiff's pending motion, Defendants did not find it "necessary" to provide Plaintiff

with those "facts" when he repeatedly sought them in order to meet the case against

him in a meaningful manner consistent with well-recognized principles of due process of law.

d. On the contrary, Hawk's repeated requests to be shown the multiple "audits", "reports", and other allegations said to have been made against Hawk have been refused.

e. Even now, with Defendants' Court filing in hand less than a week shy of sixteen months after Sebastian's first depriving him of liberty and property interests and four months after Altenkirch's effecting additional deprivations, Hawk has still not been shown the actual evidence upon which the hearsay allegations of the "audits", "reports" and "investigations" purport to rest.

f. Individuals with direct, material knowledge regarding the matters alleged against Hawk have not even been "interviewed" by the University's "investigator".

29.

a. Repeated requests made directly to the University to know when its "investigation" will be concluded and Hawk provided with the evidence and forum required by due process for a meaningful opportunity to meet the case against him have been ignored; such requests when forwarded to the University by the New Jersey State Ethics Commission are met with the assurance that matters will be completed "soon"; the first such response came in December 2009.

b. To these tactics of delay, while Hawk goes without pay and without redress for the deprivations of liberty and property interests, Defendants have now asked this Court to stay proceedings in this matter until they have completed their own internal "process" against Hawk – a stay that, judging from Defendants' tactics of delay thus far, could well outlive all involved in this action.

c. Hawk believes, and on belief alleges, that the University's delay has not only the consequence, but the purpose, of imposing constantly increasing prejudice to the prejudice already incurred by Hawk as the direct result of the Defendants' deprivations of his liberty and property interests.

30.     a. The hearsay statements set forth as if presenting credible truths in Defendants' "reports", "audits", and "investigations" are in fact false with respect to all materially prejudicial statements contained therein against Hawk.

b. It is false that Annaleena Parhankangas did not hold a tenured appointment at Helsinki University of Technology, on whose faculty she was serving at the time of her appointment to the faculty of NJIT.

c. It is false that Hawk, or any other person at the School, bore any responsibility for "uncollected tuition" from the School's students, all such collection being solely the responsibility of employees within the central administration of the University.

d. It is false that Hawk improperly spent any University funds for his own use, all such funds in question being budgeted to a "Dean's discretionary find" that Hawk was permitted, as his predecessor as Dean was permitted, to spend in any manner he chose.

e. It is false that the student whose grade Hawk is alleged to have changed "inappropriately" failed to complete all course work required of her, as the course supervisor's own written statements attached to the students certification supporting Hawk's response brief make clear.

f. It is false that Taina Ikonen's Complaint in Divorce, filed against Hawk, alleges a "romantic" relationship between Hawk and Professor Parhankangas.

g. It is false that the "relationships" alleged by Defendants between Hawk and Parhankangas or between Hawk and "Student K" are proscribed by the Act or by any other applicable statute or regulation.

h. It is false that any published statement of University policy proscribes any action attributed to Hawk by Defendants relevant to the grade of "Student K".

i.

i. The University's eager seizing, without critical assessment, upon an uncorroborated allegation against Hawk that actually **did** appear in a divorce complaint would have under any circumstances been error going to the core of the University's process.

16

ii. To rely on such a statement as evidence at the core of allegations in an "investigation" of a faculty member for violation of state law is convincing evidence of the University's inability or unwillingness to grasp or provide even minimal due process protections or to employ what for centuries of Anglo-American law have been recognized as the most essential and unquestionable judicial safeguards required in an inquiry into disputed facts.

j. The doubly false nature of the aside, made in the July 14, 2009 Letter, that Hawk "had divorced Ms. Ikonen and remarried an NJIT student named Gosia Szczepanska in the intervening years" is apparent, in the first instance, on the face of the July 14, 2009 Letter itself, which correctly asserts that "Ms. Ikonen" divorced Professor Hawk, and from NJIT's own student records, which will show that at the time of her marriage to Hawk Gosia Szczepanska was not an NJIT student.

31. Defendants may deny that some or all of the statements set forth in Paragraph 30 above, or some or all of the additional statements to be addressed in the judicial review of this matter, are false; what they cannot rationally deny is that Hawk has been given no meaningful opportunity to refute them.

### Defendants' Reckless Vendetta against Hawk has deprived innocent Third Parties of Liberty Interests without Due Process

32.

a. The liberty interests of third parties, innocent of any wrong doing, whatever might be concluded regarding Hawk, as well as the privacy rights accorded such persons under the law of torts, have been extensively violated by the University's animus-driven conduct against Dr. Hawk.

b. Third parties have been spoken of in a manner that would appear to sound in defamation.

i. On information and belief, Hawk alleges that the University's "Ethics Liaison Officer" stated that Nelson aided Hawk's efforts at hiring Professor Parhankangas because the Provost was herself having an affair with Hawk.

17

ii. The student whose grade Hawk directed be changed, a married woman and a leader in her church's ministry, has been defamed with the suggestion that Hawk's action was a reward for her efforts to obtain consulting engagements for Hawk, or for sexual liaisons.

iii. Similarly defamatory statements have been made, with equal recklessness and falsity, orally and in writing, regarding Professor Parhankangas, now widely spoken of in at least two countries as "the Finnish mistress".

33.

a. Plaintiff respectfully adopts herein by reference so many of the allegations of his original Complaint as are not inconsistent with those set forth herein above.

b. Plaintiff respectfully adopts herein by reference, as Exhibit "B" hereto, the Certification, attachments, and exhibits to his original Complaint.

c.

i. Plaintiff respectfully attaches hereto as Exhibit "C", by reference, the Certifications, attachments, and exhibits filed by Defendants with their brief and papers in opposition to Plaintiff's pending Motion (the "Attached Filings").

ii. Plaintiff's attachment, by reference, of the Attached Filings, is not an allegation or admission of any of the statements set forth in the Attached Filings.

iii. On the contrary, to the extent any such statement is prejudicial to Hawk it is expressly denied by Hawk; the Attached Filings are attached as an exhibit to the Amended Complaint precisely because the fact of such statements having been made is central to the allegations against Defendants, and by attaching the Attached Filings by reference Hawk seeks to avoid burdening the Court, the docket, and the parties with the duplicative filing of this material.

### Count I

### Statement of Claim against all Defendants arising under the law of Constitutional Tort

34. The allegations of Paragraphs 1 through 33 above are incorporated in this Paragraph 34 as if set forth herein in full.

35. The allegations of Paragraph 34 state a claim in favor of Hawk and against each and every Defendant for monetary damages under New Jersey and federal tort law arising under the Fourteenth and Fifth Amendments to the Constitution of the United States, and for equitable relief under the decisional law of New Jersey.

### Demand for Relief

Wherefore, Plaintiff demands judgment in favor of Hawk and against each and every Defendant, jointly and severally, for compensatory monetary damages, both general, in an amount exceeding the jurisdictional amount, and special in the amount of $1,000,000 in lost future opportunity; for punitive damages, as the Court finds just and proper upon the proofs offered at trial; for such permanent injunctive relief as this Court deems right and equitable after proof is heard at trial; for the costs of this action; and for such other relief as the Court finds just, equitable and proper.

### Count II

### Statement of Claim against all Defendants arising under 42 U.S.C. §1983

36. The allegations of Paragraphs 1 through 33 above are incorporated in this Paragraph 36 as if set forth herein in full.

37. The allegations of Paragraph 36 state a claim in favor of Hawk and against each and every Defendant for monetary damages under 42 U.S.C. §1983.


### Demand for Relief

Wherefore, Plaintiff demands judgment in favor of Hawk and against each and every Defendant, jointly and severally, for compensatory monetary damages, both general in an amount exceeding the jurisdictional amount and special, in the amount of $1,000,000 in lost future; for reasonable attorney's fees; for the costs of this action; and for such other relief as the Court finds just, equitable and proper.


Respectfully submitted,

/s/ Andrew Bondarowicz
Counsel for Plaintiff David L. Hawk

Dated:  February 19, 2011

19